# AFFIDAVIT
## *Of*
## *Task Force Officer Jason R. Carter*
## *Drug Enforcement Administration*

I, Jason R. Carter, being first duly sworn, do depose and state that:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), currently assigned to the DEA Springfield, Missouri, Resident Office. As such, I am an investigative and Federal law enforcement officer of the United States of America, authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the "Controlled Substances Act," Title 21, United States Code.

2. Your affiant has been a sworn law enforcement officer for over six (6) years. I have received specialized training relating to the manufacture, distribution, and possession with the intent to distribute controlled substances. Further, from my training and field experience, I have extensive knowledge of complex illegal drug manufacturing and/or distribution operations.

3. I have personally conducted or assisted in numerous investigations of criminal violations of the Controlled Substances Act and federal drug trafficking statutes. Many of these investigations focused on organizations who have distributed, manufactured, or derived income from illegal sources, specifically from the unlawful distribution of methamphetamine and other controlled substances.

4. In addition to my experience in conducting criminal investigations, I have received specialized training from the DEA and other law enforcement agencies. The trainings focused on methods of unlawful drug trafficking; the identification of controlled substances; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

1

5. I have participated in the execution of numerous search warrants in the investigation of drug trafficking. These warrants covered the search of locations to include residences of drug traffickers and their co-conspirators and associates; drug manufacturing operations; stash houses used as storage and distribution points for controlled substances; and business offices used by drug dealers as fronts to legitimize their unlawful drug trafficking activities and to conceal the proceeds obtained from unlawful drug trafficking.

6. This affidavit is made in support of an application for a warrant to search a black in color, Samsung brand, Galaxy S8 model cellular telephone, which is more fully described in Attachment A. This affidavit is based upon information that would establish probable cause to believe that evidence of violations of 21 U.S.C. §§ 846 and 841(a)(1), that is possession with the intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, is located on the cellular telephone further described in Attachment A. The evidence, in electronic form, may include the information described in Attachment B.

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Cellular or wireless telephone: a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

Case 6:17-sw-02051-DPR   Document 1-1   Filed 06/06/17   Page 2 of 20

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A Global Positioning System, or GPS, navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices

4

on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8. Based upon my training, experience, and research, I know that the device further described in Attachment A has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

9. Based upon my training and experience, I know that drug couriers and traffickers commonly use multiple methods of communication to arrange transactions and conduct business. Cellular telephones, personal computers, and other devices are frequently used to send and receive coded messages over long distances.

10. Based on my training and experience, I know that a cellular or wireless telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include GPS technology for determining the location of the device.

5

Case 6:17-sw-02051-DPR   Document 1-1   Filed 06/06/17   Page 5 of 20

11. Drug traffickers commonly maintain financial records reflecting accounting of monies collected and disbursed for the purchase and sale of controlled substance. These records have been discovered written on paper and recorded in digital files on computers, telephones, and other similar devices. Records also may include the transfer of monies involved in the sale and procurement of narcotics. Records may reflect the laundering or concealment of the profits from the sale of the narcotics, as proceeds from narcotics trafficking cannot be legally declared. In my experience, it is common for individuals engaged in illegal narcotics activities to utilize a telephone or computer to prepare and store documents relative to, and in connection with, their illegal activities. These records are typically stored on the devices' memory or on external memory devices.

12. Based upon my training and experience, I know that cellular or wireless telephones and their compatible hardware, in conjunction with computer software, are often utilized to store records that include, but are not limited to, those relating to business activities, criminal activities, associates names and addresses, and the identity and location of assets illegally gained through these criminal activities. These records are more fully described as information or data stored in the form of electronic or magnetic coding on cellular telephone and computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable SIM cards, hard drive cartridges, laser disks, tapes, floppy diskettes, and any other media capable of storing magnetic coding.

13. Based on my training and experience, I know that electronic files can be received, stored, and easily moved from one cellular telephone or electronic storage medium to another. Therefore, electronic files downloaded to or created on one cellular telephone can be copied or transferred to any other cellular telephone, computer, or storage medium at the same location.

14. Based on my training and experience, I know that cellular telephones often contain information that will help identify sources of supply and the intended recipient of the illegal drugs. I know that drug traffickers often refer to other co-conspirators by first name only or by nickname and store such information in the electronic memory of cellular phones. I know that retrieving names, phone numbers, and photographs assists in further identifying sources of supply and co-conspirators who would be difficult or nearly impossible to identify without direct knowledge of these individuals and their drug trafficking organization. I know that traffickers utilize mobile phones and digital cameras to photograph narcotics and proceeds from the sale of drugs. I know that drug traffickers photograph themselves with other co-conspirators and many times photograph themselves, and that these photographs can be transferred to computer memories.

15. Based on my training and experience, I know that once data is electronically encoded on a device, including cellular phones and computers, that the data will remain on the device indefinitely, even after it is deleted using standard methods in most circumstances. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

16. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the cellular telephone more fully described in Attachment A because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

7

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18. In addition, based on my experience, I know that searching digitalized information for evidence of crime often requires the assistance of a qualified cellular phone or computer expert who can

8

Case 6:17-sw-02051-DPR   Document 1-1   Filed 06/06/17   Page 8 of 20

accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

 a. Volume of evidence: Cellular phone storage devices such as SIM cards, hard disks, diskettes, tapes, and laser disks can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive type file names. This may require searching authorities to examine all of the stored data to determine which particular files are evidence or instrumentalities of the crime. This sorting process can take weeks to months, depending on the volume of data stored.

 b. Technical requirements: Searching cellular phone systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from the destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas

9

to discover and possibly recover hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

19. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

20. The information contained in this affidavit is based upon my personal knowledge and investigation, as well as information provided to me by other law enforcement agents involved in the investigation of this case. Not all information that I know about this investigation has been included in this affidavit, but I have provided the information to support probable cause for the search of the cellular telephone further described in Attachment A for the items listed in Attachment B.

21. On May 31, 2017, Springfield, Missouri, Police Department (SPD) Officer Nate Worland seized approximately 7.6 grams of methamphetamine, the cellular telephone more fully described in Attachment A, and $2,860 in U.S. currency from Kyle EVANS.

22. EVANS is connected to a DEA investigation that began in June of 2016 into William "Willy" JONES. Based on records from the Missouri Department of Corrections (MDOC) and my investigation as outlined below, I know that JONES is a member of the Southwest Honkeys prison gang and a source of methamphetamine supply for multiple Southwest Honkeys gang members.

23. The investigation began when SPD Confidential Informant #16-1220 (hereinafter referred to as CI) identified JONES as a "partner" of Crystal BURDETTE, from whom the CI was purchasing methamphetamine. The CI has provided information during the course of this investigation that has been

10

proven reliable and has been confirmed through surveillance, Facebook searches, other police investigation, jail records, and administrative subpoenas.

24. The CI provided BURDETTE's telephone number as (417) 770-8727. Analysis of BURDETTE's telephone tolls led to the identification of cellular telephone number (417) 496-0575 as a frequent contact of BURDETTE's. I identified that number as JONES' by using the Facebook search feature. When I entered the telephone number into the Facebook search feature, I saw that the telephone number was associated with a Facebook profile page with the name "Willy Jones" and had on it photographs that I recognized to be JONES.

25. Since identifying JONES' telephone number, I have conducted regular toll analysis of JONES' cellular telephone from records provided in response to administrative subpoenas I have issued.

26. In December 2016, I saw that JONES' cellular telephone was in regular contact with a number utilized by Nathaniel EISENHOUR. That number was (417) 234-8887 and was also identified using Facebook's open source search feature and connected to EISEHNHOUR's Facebook profile page. I was able to identify photographs of EISENHOUR on the Facebook profile from my own past contact with EISENHOUR. EISENHOUR has a criminal history of vehicle theft, burglary, and drug use. I also know him to be a documented Southwest Honkeys gang member from MDOC records.

27. On December 21, 2016, EISENHOUR was arrested for a parole violation warrant at the Lamplighter Inn, located at 1772 South Glenstone Avenue, Springfield, Greene County, Missouri. On December 28, 2016, EISENHOUR was transferred to the MDOC Fulton Diagnostic and Reception Center located in Fulton, Missouri. I requested copies of outgoing telephone calls made from that facility by EISENHOUR.

28. While reviewing those calls, I found several calls made to JONES' telephone by EISENHOUR during the month of January 2017. Those calls included vague and coded language. Based

11

on my training and experience, I know that vague and coded language is often used by drug dealers and others to attempt to thwart law enforcement or anyone else monitoring prison or jail calls from determining the true topic of conversation. Vague language refers to when the people who are conversing repeatedly and purposefully fail to identify what they are actually talking about, but instead refer to the topic of conversation as "it." Coded language is when the people conversing substitute another item for the true topic of the conversation, such as the word "bread" for money or "stuff" for drugs.

29. Based on my training and experience in coded and vague language often used by drug dealers, I was able to discern that JONES had contacted EISENHOUR's source of methamphetamine supply, later identified as Edwardo "Eddie" ESPINOZA, and had begun conducting drug business with him. During a telephone call from EISENHOUR to JONES on January 24, 2017, JONES joked with EISENHOUR and said, "He (Eddie) wasn't ready for me."

30. I continued obtaining copies of recorded prison calls and found one placed on March 3, 2017, from EISENHOUR to telephone number (417) 306-5398. An open source search of Facebook identified this telephone as one utilized by Jared ALLEN. During that conversation, based on my training and experience, I was able to determine that ALLEN and EISENHOUR were using vague and coded language to discuss ALLEN's drug activity. ALLEN told EISENHOUR he was selling drugs with John DEWEESE, and they were being supplied those drugs by JONES. DEWEESE and ALLEN are also both MDOC documented members of the Southwest Honkeys prison gang.

31. Another Facebook search showed a profile bearing photos and DEWEESE's name was associated with telephone number (417) 824-2483.

32. On March 9, 2017, there was a telephone call from EISENHOUR to JONES. During that telephone call, JONES told EISENHOUR he had given DEWEESE a chance because of EISENHOUR's

12

"word," referring to supplying DEWEESE with methamphetamine because EISENHOUR had "vouched" for him.

33. Another telephone call from EISENHOUR to JONES on March 11, 2017, included another conversation about DEWEESE's involvement in JONES' drug activity, as well as another reference to ESPINOZA's struggle to keep up with supplying JONES' large demand for methamphetamine. JONES joked again saying, "He wasn't ready for me," and "He needs a dump truck."

34. On April 14, 2017, ALLEN was arrested by SPD for numerous felony warrants. At that time, he was found to be in possession of suspected methamphetamine and heroin. On April 20, 2017, DEWEESE was arrested after he was found to be in possession of approximately 40 grams of suspected methamphetamine and a firearm during a traffic stop. Continued analysis of JONES' telephone tolls showed he had been in regular contact with DEWEESE's telephone prior to DEWEESE's arrest.

35. That analysis also showed JONES was in contact with telephone number (417) 813-4105 multiple times each week. That telephone number is a number associated with EVANS. The telephone toll analysis revealed that JONES' phone had been in contact with EVANS' phone 123 times since March 29, 2017, which coincided with EVANS' release from the Missouri Department of Corrections that same month. The most recent contact that I know about occurred between both numbers on May 24, 2017, at 10:39 a.m. Based on the contacts between JONES and EVANS, the investigation above and below, and my training and experience, I believe that JONES and EVANS are involved together in the distribution of methamphetamine.

36. DEA TFO Jeff Saylor was able to identify EVANS as the user of the number above by using the Greene County, Missouri, Jail telephone system (Tel-Mate). The lobby of the Greene County Jail has a Tel-Mate kiosk that can be used by an inmate's friends or family to deposit money on that inmate's telephone or commissary accounts. When someone makes a deposit into that kiosk, a photo of

13

the depositor is taken. That depositor is also required to provide a name, telephone number, and address that is then associated with the depositor's photo. By searching the telephone number (417) 813-4105 in that system, TFO Saylor found the associated profile contained the photo, name, and a past address of EVANS. Additionally, TFO Saylor listened to recorded jail telephone calls made by various inmates to that number. Multiple times during those calls, the inmate caller referred to that telephone number's user as "Kyle."

37. EVANS is also an MDOC documented member of the Southwest Honkeys prison gang. EVANS is listed in past SPD reports involving drug and weapon violations, as well as assault and stolen vehicle reports. EVANS is currently on parole for two counts of assault on a law enforcement officer.

38. On May 31, 2017, SPD Detectives Craig Harter and Josh Tucker observed EVANS driving a red in color 1996 Dodge Ram 2500 pickup, in Springfield, Greene County, Missouri. The truck was registered to EVANS, and they were able to identify him as the sole occupant.

39. Detective Harter was aware of my investigation, which included EVANS. Detective Harter requested an officer respond to the area to assist with a traffic stop of EVANS' vehicle. Detectives maintained physical surveillance of EVANS while Officer Worland responded to the area. Once Officer Worland arrived in the area, he observed the truck EVANS was driving had an inoperable passenger side tail light. Officer Worland conducted a traffic stop of the truck near the intersection of Chestnut Expressway and Broadway Avenue, Springfield, Greene County, Missouri, for the equipment violation.

40. Officer Worland noted that EVANS appeared nervous during the traffic stop and that EVANS' hands and arms were visibly shaking while speaking to him. Because of EVANS' nervous behavior and history of drug activity, Officer Worland requested consent to search EVANS' person. EVANS agreed to the search, and Officer Worland located $2,860 in U.S. currency in EVANS' front left pants pocket.

41. Officer Worland also observed part of a plastic bag sticking out of the waistband of EVANS' jeans. Officer Worland removed the bag from EVANS' pants and found it contained a white, crystalline substance that was consistent with methamphetamine. Officer Worland informed EVANS he was under arrest and escorted him to his patrol vehicle.

42. Before placing EVANS in the transport area of the patrol car, Officer Worland searched the caged area in front of EVANS. He found no contraband in the caged area, and told EVANS he would be responsible for any contraband located in the vehicle after he was removed. Officer Worland then secured EVANS in the caged area and conducted a probable cause search of EVANS' truck. During the search of EVANS's truck, Officer Worland located the black in color Samsung Galaxy S8 cellular telephone further described in Attachment A.

43. Officer Worland contacted Detective Harter and advised him of the result of the stop. Detective Harter relayed that information to me via telephone, and I requested that Officer Worland seize the telephone as evidence at that time.

44. After transporting EVANS to the Greene County, Missouri, Jail, Officer Worland removed EVANS from the caged transport area of the vehicle. Officer Worland conducted a search of the caged transport area and located another plastic baggie that had been discarded and concealed between the prisoner backrest and seat cushion. That baggie also contained a white, crystalline substance consistent with methamphetamine. EVANS denied concealing the baggie in that location and accused Officer Worland of "planting" evidence in the patrol car. EVANS was booked into the Greene County Jail on a 24-hour hold.

45. On June 1, 2017, SPD Detective Jon Conklin and I responded to the Greene County, Missouri, Jail to conduct an interview of EVANS. EVANS met Detective Conklin and me in an interview

15

room, and I advised him of his *Miranda* rights. EVANS stated he understood his rights, and agreed to speak to me without a lawyer present.

46. I asked EVANS about his documented membership in the Southwest Honkeys prison gang. He admitted to being a member for the past eight years, and stated he joined the gang while incarcerated at the Western Missouri Correctional Center located in Cameron, Missouri. I asked him who had sponsored him during his initiation phase of joining the gang, and EVANS refused to answer that question.

47. I then asked EVANS about the traffic stop and the methamphetamine located on his person during the consent search. EVANS stated he had not been in possession of methamphetamine, and he claimed the officer "planted" the evidence on him in order to arrest him. EVANS went on further to say if he had been in possession of methamphetamine, he would have fled from police instead of cooperating. He told me his criminal record would show he normally fled from police in the past when he was in possession of drugs.

48. I then asked EVANS about the money found in his pocket. He claimed that money was earned legitimately while working for a local landscaping and lawn mowing company. EVANS stated he had worked for the landscaping company since March 2017, and he earned $14.00 per hour. He claimed the reason he had that much money on his person was because he was moving to an address on West Swan Street on that date, and he had the money to pay for his bills incurred during the move. Based on my training, experience, and knowledge that drug dealers frequently carry large amounts of cash and the fact that the currency was recovered with EVANS while he was also in possession of a dealer amount of methamphetamine, I believe that the U.S. currency was the proceeds of drug sales.

49. I asked EVANS if he sold drugs, and he denied doing so. He did state he had a methamphetamine addiction and had relapsed once since his release from the Missouri Department of

16

Corrections in March 2017. EVANS claimed the relapse occurred approximately one week prior to his arrest.

50. I then concluded the interview and released EVANS back into the custody of jail staff. I then proceeded to the SPD Property Room. I removed both bags of methamphetamine and the cellular telephone seized from EVANS by Officer Worland the night before, further described in Attachment A. I conducted field tests of the contents of both bags and found both tests showed a positive result for the presence of methamphetamine. I weighed each bag and its contents, and found the first bag and its contents weighed 1.3 grams. The second bag and its contents weighed 6.3 grams. The total weight of both bags and their respective packaging weighed 7.6 grams. Due to my training and experience, I know that amount to be a distributive amount of methamphetamine.

51. The black Samsung cellular telephone, more fully described in Attachment A, has remained in the custody and care of law enforcement since the time it was seized. It has not been altered, and based on my training and experience, the data that it contains should be intact and retrievable.

52. Your affiant respectfully requests that a search warrant be issued authorizing the DEA, specifically the undersigned or any other certified computer analysis forensic examiner, to conduct a thorough search of the contents of the attached Attachment A for the items listed in Attachment B, which are evidence of violations of 21 U.S.C. §§ 846 and 841(a)(1), that is possession with the intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances.

53. In light of the nature of this affidavit and in order to keep from compromising the on-going nature of this investigation, I request that it be sealed and that service of the order granting authorization

for searching the cellular telephone further described in Attachment A be delayed for 30 days following execution of the order.

    Further your affiant sayeth naught.

_____
Jason R. Carter
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me in my presence on this 6th day of June, 2017.

_____
David P. Rush
United States Magistrate Judge

18

Case 6:17-sw-02051-DPR   Document 1-1   Filed 06/06/17   Page 18 of 20

## Attachment A

### PROPERTY TO BE SEARCHED

The property to be searched is a Samsung Galaxy S8, model SM-G950U, IMEI number 355986083439258, cellular telephone currently in the custody of the Springfield Police Department Property Room, located at 321 East Chestnut Expressway, Springfield, Missouri, under barcode #P17018075.



## Attachment B

### PROPERTY TO BE SEIZED

All records on the device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846, including:

a. Any and all documents, records, emails, instant messages/chats, text messages, video messages, or other communications and Internet history (in documentary or electronic form) pertaining to the possession, receipt, distribution, or production of controlled substances;

b. Any and all records showing calls made, received, or missed pertaining to the possession, receipt, distribution, or production of controlled substances;

c. Any and all records showing text (SMS) messages or multi-media (MMS) messages made or received pertaining to the possession, receipt, distribution, or production of controlled substances;

d. Any and all voice messages pertaining to the possession, receipt, distribution, or production of controlled substances;

e. Any and all contact lists, calendar information, or other data pertaining to the possession, receipt, distribution, or production of controlled substances;

f. Any and all visual depictions, including still images, videos, films, or other recordings which pertain to the possession, receipt, distribution, or production of controlled substances;

g. Any and all data from programs, or "apps" that are used in furtherance of the possession, receipt, distribution, or production of controlled substances;

h. Any and all data contained on removable media pertaining to the possession, receipt, distribution, or production of controlled substances;

i. Any and all passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code;

j. Any and all records, documents, invoices, notes, and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of the searched media; and

k. Any and all documents, images, and records indicating the owner and possessor of the searched media.